# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs November 18, 2003

## STATE OF TENNESSEE v. MICHAEL W. MAPLES

**Appeal from the Circuit Court for Blount County**
**Nos. C-13676, C-13678     D. Kelly Thomas, Jr., Judge**

---

**No. E2002-02691-CCA-R3-CD**
**March 19, 2004**

---

A Blount County Circuit Court jury convicted the defendant, Michael W. Maples, of two counts of especially aggravated kidnapping, a Class A felony. The trial court sentenced him to concurrent twenty-five-year sentences for the two convictions. In this appeal, the defendant claims (1) that the evidence is insufficient to support his convictions and (2) that his sentences are excessive. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Julie A. Rice, Knoxville, Tennessee (on appeal); and Mack Garner, District Public Defender (at trial), for the appellant, Michael W. Maples.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; Michael L. Flynn, District Attorney General; and Ellen Lee Berez, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case relates to the defendant's conduct toward Benita Cotte and Jeffrey McKee on December 5, 2001. Jason Nance, a detective for the Blount County Sheriff's Department at the time of the incident, testified that at 8:00 a.m. on December 5, 2001, he responded to a dispatch relating a footchase by Officer Terry Orr. He said that later that day, he interviewed the defendant, who stated the following: He and Ms. Cotte were married but separated and having marital problems. The defendant had waited at Ms. Cotte's apartment for an hour before she and Mr. McKee left for work. He wanted to talk to his wife and would do anything necessary to talk to her. The defendant had a sawed-off shotgun and jumped into the back of Mr. McKee's car. He made Mr. McKee put handcuffs on Ms. Cotte and then forced Mr. McKee into the trunk of his own car. Ms. Cotte convinced the defendant to let Mr. McKee go but the defendant told Mr. McKee that if he called the

police, he would kill Ms. Cotte. The defendant said Ms. Cotte was later able to signal a passing police officer for help and the defendant ran from the scene. Detective Nance testified that a loaded, sawed-off shotgun was found in the passenger-side floorboard of Ms. Cotte's car after the incident.

On cross-examination, Detective Nance testified that the defendant was transported to Blount Memorial Hospital after being arrested because he appeared to be having seizures. He said the defendant's and Ms. Cotte's cars were located together at the scene of the kidnapping, fifty yards from Ms. Cotte's apartment. He said he remembered seeing red marks from handcuffs on Ms. Cotte. Detective Nance said Mr. McKee's car was not at the scene when he arrived because Mr. McKee had already left for work.

Benita Cotte testified that on December 5, 2001, she had been married to the defendant for over a year but had been separated from him for over a month. She said the defendant wrote her notes and followed her during their separation. She said, though, that the letters were not threatening and that she was not worried about the defendant becoming violent at that time. She said that on October 28, 2001, he was waiting for her inside her home when she came home from work and that he pushed her onto the couch, telling her that they needed to talk. She said he pushed her a second time when she told him she was going to call the police. She said that after this incident, she obtained an order of protection against the defendant and moved to a separate residence. However, she worried that he would learn where she lived. She said the defendant also called her mother, attempting to convince her mother to intervene on his behalf.

Ms. Cotte testified that on December 5, 2001, at about 6:50 a.m., she and Jeff McKee left her apartment to go to work. She said that they walked outside to Mr. McKee's car and that when they were inside his car, she noticed Mr. McKee trying to lock the car's doors. She said she saw the defendant get into the back seat of the car and put a shotgun to the back of Mr. McKee's head. She said the defendant was wearing white surgical gloves and had a pair of pantyhose pulled over his head. She said that although the defendant's face was distorted by the pantyhose, she knew it was the defendant. She said the defendant first ordered Mr. McKee to drive but immediately changed his mind and told Mr. McKee to stop. She said that she was going to call the police on her cellular telephone but that the defendant saw the telephone and told her that he would kill Mr. McKee if she called. She said she threw her telephone onto the back seat of the car. She said the defendant pulled out a pair of handcuffs, gave them to Mr. McKee, and told him to lock her hands behind her back. She said, though, that she was able to free one arm from the handcuffs. She said the defendant held the shotgun against Mr. McKee's back and forced him into the trunk of his own car. She said she heard the defendant tell Mr. McKee that he would let him go when they reached their destination. She said she was afraid the defendant was going to shoot her and Mr. McKee. She said she convinced the defendant to let Mr. McKee leave by telling him she would go with the defendant to wherever he wanted her to go. She said the defendant told Mr. McKee that if the police followed them, he would kill her. She said that they entered her car and that Mr. McKee left in his own car.

Ms. Cotte testified that she was in the driver's seat and that when she delayed in leaving the area, the defendant said that if she did not start driving, he would shoot her. She said that she drove

fifty to seventy-five yards to the defendant's parked car and that the defendant ordered her to get into his car. She said that when she refused, the defendant pointed his gun at her and told her that if she did not get into his car, he would shoot her. She said that as she was getting out of her car, she saw a police car and started waiving her arms. She said the handcuffs were still attached to her left wrist at this time. She said Officer Terry Orr saw her waiving and came to her aid. She said that Officer Orr told the defendant to stop but that the defendant threw the shotgun into the backseat of her car and ran. She said that throughout the kidnapping, she was afraid the defendant was going to kill her and did not feel free to leave at any time.

On cross-examination, Ms. Cotte testified that she had been married to the defendant for over a year and had lived with him for six years before the separation. She acknowledged that she called the defendant to talk about a divorce after filing the order of protection. She said that when the defendant followed her to work and left notes on her car, he did not try to talk to her and that she did not see him carrying any weapons. She said she worked with Mr. McKee and was romantically involved with him at the time of the separation. She said Mr. McKee moved into her apartment about one week after she had changed residences. She said she did not tell the defendant about her relationship with Mr. McKee or about her move to a different location. She said that during the incident on December 5, 2001, she was able to get the handcuff off her right wrist when the defendant and Mr. McKee got out of the car and Mr. McKee was forced into the trunk. She said the defendant told her he only wanted to talk to her. She acknowledged that Mr. McKee was only in the trunk for a short period of time and that the defendant gave Mr. McKee's keys back to him when he let Mr. McKee out of the trunk. She acknowledged that the defendant did not attempt to stop Mr. McKee from leaving. She acknowledged that the defendant never shot the gun and that he did not injure her or Mr. McKee, save for the red marks from the handcuffs.

On redirect examination, Ms. Cotte testified that the defendant pointed the gun at her and Mr. McKee. She said she left the defendant because she did not love him anymore and because of his violence toward her on October 28, 2001. On recross-examination, Ms. Cotte acknowledged that she had already told the defendant that she wanted a divorce when the October 28 incident occurred.

Jeffrey McKee testified that he worked with Ms. Cotte and that they were romantically involved while she was separated from the defendant. He said that on the morning of December 5, when he entered his car, he heard the defendant say, "Hold it," as Mr. McKee was trying to close his door. He said the defendant entered the back seat of the car holding a gun. He said the defendant was wearing white gloves and had pantyhose covering his face. He said the defendant told him to start the car and then ordered him to back the car up or he would kill Mr. McKee. He said the defendant ordered him at gunpoint to turn off the engine, leave the car and handcuff Ms. Cotte, and to get into the trunk. Mr. McKee said he complied with the defendant's orders. He said he was locked in the trunk for about two to three minutes before hearing Ms. Cotte tell the defendant that if he would let Mr. McKee leave, she would go with him. He said that the defendant let him out, warning him that the defendant would kill Ms. Cotte if he went to the police. He said he left in his car, saw a police officer at a gas station, and told the officer what had happened.

On cross-examination, Mr. McKee testified that he became involved romantically with Ms. Cotte after she separated from the defendant. He said that on December 5, 2001, when he tried to shut his car door, something was blocking it and he heard the defendant shout, "Hold it." He said that the defendant asked him why he was with Ms. Cotte and that he responded that it was because they were separated. He said that when he tried to fasten the handcuffs on Ms. Cotte, the right one would not "click." He acknowledged that he had gone to church with the defendant and the defendant's father. He said that although the defendant may have said he was going to drop Mr. McKee off somewhere, he was still very frightened because the defendant had already threatened to kill him twice. He acknowledged that the defendant was primarily interested in talking to Ms. Cotte, not him.

Bobbie Payne, Ms. Cotte's mother, testified that the defendant called her and told her that he wanted to talk to Ms. Cotte. She said he wanted her to talk Ms. Cotte into coming back to him. She said the defendant told her that if he could not have Ms. Cotte, he would kill Ms. Cotte and anyone who was with her. She said the defendant came to her trailer and gave her three letters, two for her and her husband and one for Ms. Cotte. She said she told the defendant that the marriage was over and for him to get on with his life. She said that in one of the letters, the defendant wrote that he would never let Ms. Cotte go and that he wanted her to be with him. On cross-examination, Mrs. Payne testified that she had seen the defendant many times over the course of his relationship with her daughter and that he had never acted the way he did on December 5, 2001. She said that on November 2, 2001, the defendant called her on the telephone, telling her that he was going to kidnap Ms. Cotte, force her to have sex with him, and then kill her. She said that she told her daughter about this threat and that she did not speak with the defendant after this conversation.

Officer Terry Orr of the Blount County Sheriff's Department testified that while he was at a gas station, Mr. McKee arrived and told him that a man had forced him into his car's trunk at gunpoint. He said Mr. McKee stated that the man with the gun was getting ready to leave his apartment complex with Mr. McKee's girlfriend. Officer Orr said he told Mr. McKee to wait at the gas station and then drove to the area Mr. McKee had described. He said he saw a woman waiving her arms frantically and screaming "he's got a gun and he's going to kill me." He said he noticed a handcuff was dangling from one of the woman's arms. He said that when he got out of his patrol car, the defendant got out of the car and ran away from him. He said that he ordered the defendant to stop but that the defendant continued to run. He said that while he was looking for the defendant, a man drove by Officer Orr and told him where the defendant was hiding. Officer Orr said he saw the defendant hiding underneath the car. He said he grabbed the defendant and handcuffed him. He said that when he first grabbed the defendant, the defendant dropped a shotgun shell from his hand. Officer Orr said the defendant was wearing white latex gloves and was found with nylon stockings and a handcuff key in his pockets. He said that when he arrested the defendant and placed him in his patrol car, he noticed that the defendant was convulsing and called for an ambulance. He said that after about an hour in the emergency room, the attending doctors released the defendant into his custody. He said that the doctors did not indicate that there was anything wrong with the defendant and that after leaving the emergency room, the defendant did not have any more convulsions. Officer Orr said that when he interviewed Ms. Cotte, she stated the defendant had approached her

with a shotgun as she and Mr. McKee were leaving for work and had threatened to kill them both. Officer Orr said she told him that the defendant locked Mr. McKee in the trunk and had only let him go when she promised to go with him. He said she told him that the shotgun was in the floorboard of her car, on the passenger's side.

On cross-examination, Officer Orr testified that Ms. Cotte was only handcuffed on one wrist. He said the right cuff was defective and would not lock. He said he talked to Mr. McKee for about ninety seconds at the gas station. He said the distance between the gas station and where he found the defendant and Ms. Cotte was about two hundred yards. He said that when he first saw Ms. Cotte's car, it was not moving. He said he caught the defendant less than five minutes after the defendant ran from him.

Benita Cotte, recalled by the defense, testified that she was separated from the defendant before October 28, 2001, and began living with Mr. McKee in early November. She said her mother did not know about her relationship with Mr. McKee until after the October 28 domestic incident with the defendant. She said that after she filed for divorce, she received three notes from the defendant. She said her mother told her that she had talked to the defendant on the telephone but she could not remember what her mother had told her about her conversation with the defendant. She said that if her mother had told her that the defendant had threatened to kidnap, rape, and kill her, she would have been afraid, but she did not remember her mother telling her this. She said her mother told her about the telephone conversation with the defendant after the incident on December 5, 2001. She acknowledged that in her first divorce complaint signed on November 29, 2001, she did not allege cruelty, inappropriate marital conduct, or threats made by the defendant. She said that as of November 29, she did not fear the defendant. On cross-examination, Ms. Cotte testified that the attorney who filed the divorce papers that she signed on November 29 withdrew from her case after the defendant went to jail and that she then retained counsel from Legal Aid. She said that when her new counsel filed for divorce on February 14, 2002, her grounds for divorce included inappropriate marital conduct rendering cohabitation unsafe and improper.

The defendant testified that he dropped out of school in the eighth grade and had worked mainly on farms since quitting school. He said that he met Ms. Cotte in 1995 and that their relationship lasted about five and one-half years. He said that during the last four months of his marriage, he went to church with his father but that Ms. Cotte only went with him once. He said that on October 28, 2001, about one week after he had met Mr. McKee, Ms. Cotte told him that they needed some time apart. He said Ms. Cotte did not explain why she wanted a separation and did not tell him that she was having a romantic relationship with Mr. McKee. He said he left notes on Ms. Cotte's car stating that he loved her and that he did not understand why she had left him. He said Ms. Cotte called him once on the telephone during the separation to ask if he would sign divorce papers, to which the defendant responded that he would not. He said he did not know that Ms. Cotte and Mr. McKee were involved in a romantic relationship until December 4, 2001, when he saw both of their cars parked together at an apartment complex. He said he loved his wife and had wanted to find out why she had an affair.

The defendant testified that after he determined that his wife was having an affair, he bought a shotgun and sawed off the barrel of the gun. He said that he bought the gun for protection against Mr. McKee but that he had no plans to confront his wife and Mr. McKee at that time. He said that on December 5, he went to Ms. Cotte's apartment to talk to her before she went to work. He said he did not know why he wore gloves or put pantyhose on his head when he confronted Ms. Cotte and Mr. McKee. He said he already had the gloves, pantyhose, and handcuffs in his car and did not buy them specifically for kidnapping Ms. Cotte. He said that when the pair got into Mr. McKee's car, he entered the car through the rear door. He said he never blocked Mr. McKee from shutting the car door. He said he put the gun on safety and told Mr. McKee that he was only there to talk to his wife. He said, though, that he asked Mr. McKee why he was having an affair with his wife. He said he told Mr. McKee to put the car into park and turn the car off. He said that he told Ms. Cotte not to use her cellular telephone and that she threw it onto the back seat.

The defendant testified that he made Mr. McKee put handcuffs on Ms. Cotte because he was afraid one of them might attack him and that he then told Mr. McKee to get into the trunk of the car. He said that because the handcuffs were defective, Ms. Cotte's hands were never handcuffed to each other. He said he told Mr. McKee to get into the trunk because he wanted to talk to his wife alone. He said he let Mr. McKee out of the trunk after about a minute because Ms. Cotte told him that if he let Mr. McKee out, she would talk with him. He said he was lying when he told Mr. McKee that if he called the police, he would kill Ms. Cotte. He said that he and Ms. Cotte got into Ms. Cotte's car and that he told her to drive. He said that he asked her to ride in his car but that she refused. He said that Ms. Cotte then signaled a police officer and that he ran away. The defendant said he did not intend to hurt anyone and only wanted to talk to his wife. He said that he was not happy with his actions on December 5, 2001. He said, however, that it was better to know the truth than to let his wife lie to him.

On cross-examination, the defendant testified that he had never been diagnosed with epilepsy or a seizure disorder and denied that he was only pretending to have seizures after being taken into custody by the police. He acknowledged calling Mrs. Payne several times to ask about Ms. Cotte but denied that he told Mrs. Payne what his plans for Ms. Cotte were. He acknowledged that he bought a shotgun and planned a confrontation with Ms. Cotte after learning on December 4, 2001, that Ms. Cotte was in a relationship with Mr. McKee. He admitted using the surgical gloves to avoid leaving fingerprints on the gun but denied pointing the gun at the back of Mr. McKee's head. He acknowledged that Ms. Cotte and Mr. McKee had no way of knowing whether or not he was going to kill them. He said he only brought the gun with him because he thought Mr. McKee might have a gun as well.

The defendant testified that in his confession to Detective Nance, he never said that Ms. Cotte was not handcuffed. He acknowledged that he had two packages of rope in his car, extra sets of pantyhose, extra surgical gloves, a wedding picture, and two extra license plates. He denied that he kidnapped Ms. Cotte in order to have sex with her and to kill her. The defendant acknowledged that he had been convicted of personal impersonation and attempted theft. Jeff McKee, recalled by the

-6-

state, testified that when he handcuffed Ms. Cotte, he heard both cuffs click and the handcuffs were firmly around her wrists.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant claims that the evidence is insufficient because the state failed to prove that he knowingly kidnapped the victims, that there was a genuine threat of force, and that the defendant removed or confined the victims sufficiently. The state argues that the evidence is sufficient. We agree with the state.

Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

Especially aggravated kidnapping is defined as false imprisonment "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon [.]" T.C.A. § 39-13-305(a)(1). A person commits the offense of false imprisonment when he or she "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." T.C.A. § 39-13-302(a).

The evidence is sufficient to support the defendant's convictions. Mrs. Payne testified at trial that the defendant told her during a telephone conversation that he was going to kidnap, rape, and then kill Ms. Cotte. Ms. Cotte and Mr. McKee testified that the defendant entered Mr. McKee's car with a gun, held the gun to the back of Mr. McKee's head, and forced Mr. McKee to handcuff Ms. Cotte. Mr. McKee testified that when he handcuffed Ms. Cotte, the handcuffs were securely around her wrists. They both testified that the defendant was wearing latex gloves and was wearing pantyhose over his face. They testified that the defendant told each of them at various times during the kidnapping that if they did not do what he said, he would kill them. They testified that the defendant forced Mr. McKee to get into the trunk of his own car at gunpoint and did not release him until Ms. Cotte agreed to go with the defendant. Ms. Cotte and Mr. McKee testified that they were afraid the defendant would kill them throughout the incident.

The defendant acknowledged at trial that he bought a gun and planned the kidnapping of Ms. Cotte the day before the incident. He acknowledged that he told Mr. McKee to handcuff Ms. Cotte and forced Mr. McKee into the trunk of Mr. McKee's car. The evidence shows that the defendant planned the kidnapping of Ms. Cotte and prevented Ms. Cotte and Mr. McKee from leaving by threatening them with a shotgun. Although the defendant argues there was no genuine threat of force, the evidence reflects that the defendant's gun was loaded and he threatened to kill both Ms.

Cotte and Mr. McKee several times during the encounter if they did not obey his orders. In addition, regardless of whether Ms. Cotte was handcuffed securely, the defendant forced her with the use of a gun to remain with him throughout the incident. Finally, contrary to the defendant's claim, there is no requirement that victims be confined for any "sufficient" length of time in order to convict a defendant of kidnapping. See State v. Turner, 41 S.W.3d 663, 670 (Tenn. Crim. App. 2000) (holding that statutes do not require a defendant to confine a victim for any certain period of time). It is immaterial that Mr. McKee was only confined in the trunk for a short period of time. The evidence presented at trial supports the defendant's convictions for especially aggravated kidnapping.

## II. SENTENCING

The defendant contends that his twenty-five-year sentences are excessive. Specifically, he argues that because he released Mr. McKee unharmed and because of the unusual circumstances of the case, the trial court erred when it did not reduce his sentences. See T.C.A. § 39-13-305(b)(2); T.C.A. § 40-35-113(11). The state claims that the defendant's sentences are not excessive. We agree with the state.

At the sentencing hearing, the defendant testified that he dropped out of school after the eighth grade and could not read or write very well. He said he had received a disability check from the government for about twelve years because of a learning disability and a bad back. He said that his testimony at trial was the truth, that he only wanted to talk to his wife when he kidnapped her, and that he brought the gun for protection. He said he did not drink alcohol, was not using drugs, and was on no medication when he kidnapped the victims. He said, though, that he was confused and did not know what he was going to do that day. He said he never intended to hurt Ms. Cotte or Mr. McKee.

The defendant testified that although he had two public intoxication convictions and one driving under the influence (DUI) conviction, he did not believe he had a problem with alcohol and did not drink alcohol anymore. He denied any knowledge of a reckless endangerment conviction. He said that in 1983, he pled guilty to aggravated assault when he had been accused of shooting someone. He said, however, that he was innocent and had done nothing wrong in that case. He said that before he began receiving disability checks, he worked mainly on farms. He said that with the exception of his learning disability, he had not been diagnosed with any mental health problems. He said that when he was released from prison, he was going to live with his father and that he wanted to go to church so that he could help people. He said that in the time since the December 5 kidnapping, he had learned that he could not trust anybody and that he would never get married again. He said that he was sorry but that if he had been told the truth by his wife, the incident never would have happened. On cross-examination, he acknowledged that before he pled guilty to aggravated assault for the 1983 shooting incident, he was charged with attempted first degree murder. He also acknowledged that he violated parole in 1984 when he was arrested for third-degree burglary. He said Ms. Cotte was equally at fault for his actions.

According to the presentence report, the then forty-one-year-old defendant was divorced and had no children. The defendant reported that his health was poor and that he was a diabetic, suffered from a heart murmur, had a deteriorated disc in his back, had a hernia, and had ear problems. He said he began drinking at age thirteen but quit drinking alcohol two to three years before. He said he had smoked marijuana but not in the last six years. He reported that he had never been in a substance abuse treatment program. The report shows that the defendant has prior convictions for aggravated assault, two counts of public intoxication, DUI, reckless endangerment, criminal impersonation, three counts of driving with a revoked license, theft under $500 dollars, and possession of a firearm by a felon.

The trial court sentenced the defendant as a Range I, standard offender and imposed the maximum twenty-five-year sentence for his two Class A especially aggravated kidnapping convictions. The court ordered the sentences to be served concurrently. It enhanced the defendant's sentence based upon factors (2), the defendant has criminal convictions or behavior in addition to that necessary to establish his range, and (9), he "has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community." See T.C.A. § 40-35-114. It weighed enhancement factor (2) very heavily. The trial court considered mitigating factor (2), that the defendant committed the crime under strong provocation, but concluded that this mitigator did not carry sufficient weight to drop the sentence below the twenty-five-year maximum. See T.C.A. § 40-35-113(2).

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d). As the Sentencing Commission Comments to this section note, the burden is now on the defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. § 40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994).

The sentence to be imposed by the trial court is presumptively the midpoint in the range for a Class A felony unless there are enhancement factors present. T.C.A. § 40-35-210(c). Procedurally, the trial court is to increase the sentence within the range based upon the existence of enhancement factors and, then, reduce the sentence as appropriate for any mitigating factors. T.C.A. § 40-35-210(d), (e). The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. T.C.A. § 40-35-210, Sentencing Commission Comments; Moss, 727 S.W.2d at 237; see Ashby, 823 S.W.2d at 169.

The defendant argues that the trial court erred by not applying mitigating factor (11), that although guilty of the crime, he "committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct[.]" See T.C.A. § 40-35-113(11). At trial, Mrs. Payne testified that the defendant told her during their telephone conversation on November 2, 2001, that he was going to kidnap, rape, and kill Ms. Cotte. The defendant hid in the parking lot at Ms. Cotte's apartment complex for over an hour on the morning of the kidnapping, waiting for Ms. Cotte to leave for work. During the kidnapping, the defendant wore surgical gloves and pantyhose and used handcuffs he had brought to secure Ms. Cotte. Rope, additional surgical gloves, and extra license plates were also found in the defendant's car. This does not reflect that the defendant acted impulsively after finding out that his wife was having an affair. He planned his actions, prepared for the kidnapping, and waited patiently for Ms. Cotte to leave her apartment. In this respect, we do not see the lack of a sustained intent to violate the law that would justify mitigation under factor (11).

The defendant next claims that the trial court erred because it did not consider that he released Mr. McKee alive and unharmed and that the trial court, therefore, should have reduced his sentence below the twenty-five-year maximum. Pursuant to T.C.A. § 39-13-305(b)(2), "[i]f the offender voluntarily releases the victim alive . . . such action[] shall be considered by the court as a mitigating factor at the time of sentencing." See State v. Arnett, 49 S.W.3d 250 (Tenn. 2001). We conclude that the trial court erred by not considering the defendant's voluntary release of Mr. McKee but hold that the defendant's sentences should not be reduced. The evidence shows that the only reason the defendant released Mr. McKee was because Ms. Cotte agreed to go with the defendant to wherever he wanted her to go. In addition, the defendant never gave any indication that he intended to release Ms. Cotte before she signaled to Officer Orr. Under these circumstances, the defendant's release of Mr. McKee is entitled to very little weight. Taking into account the defendant's extensive criminal history and the minimal weight afforded to this mitigating factor, we conclude that the trial court's imposition of the maximum sentence for the defendant's two especially aggravated kidnapping convictions was proper.

Based on the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
JOSEPH M. TIPTON, JUDGE

-10-